# IN THE COURT OF APPEALS OF TENNESSEE
# AT NASHVILLE
## March 2000 Session

## GEORGE A. HENDERSON v. MARILYN JO TUCKER HENDERSON

**Appeal from the Chancery Court for Williamson County**
**No. 24601     Donald P. Harris, Judge**

---

**No. M1999-00912-COA-R3-CV - Filed September 14, 2000**

---

This appeal involves a dispute over the Trial Court's valuation and division of marital property in this divorce action. Mrs. Henderson contends that the Trial Court undervalued the marital business, Quality Systems, Inc. Additionally, Mrs. Henderson asserts the Trial Court erred in dividing the marital assets and liabilities, denying alimony and attorney's fees and in ordering her to refund alimony *pendente lite* payments. We affirm the Trial Court's order, except for the denial of alimony. We vacate the Trial Court's determination on the issue of alimony and remand for a determination of the proper type and amount of alimony to be awarded to Mrs. Henderson.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part;**
**Vacated in Part and Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which D. MICHAEL SWINEY, J., joined. Herschel P. Franks, J., filed a separate opinion concurring in part and dissenting in part.

Michael W. Binkley, Nashville, Tennessee, for the appellant, Marilyn Jo Tucker Henderson

Ernest W. Williams and Dana C. McLendon III, Franklin, Tennessee, for the appellee, George Arnold Henderson

## OPINION

The parties married on December 26, 1989. On March 21, 1997, a confrontation occurred between the parties which resulted in Mr. Henderson being charged with aggravated assault, aggravated kidnaping and attempted murder. A jury acquitted Mr. Henderson of all charges.

On March 27, 1997, Mr. Henderson filed a complaint for divorce. The Trial Court entered an Order *Pendente Lite* on May 1, 1997, which provided that Mr. Henderson continue to make payments for the mortgages on the marital home, utilities and maintenance fees, car insurance, health

and dental insurance, disability insurance and minimum credit card payments on Mrs. Henderson's cards. Additionally, the Trial Court ordered Mr. Henderson to pay alimony in the amount of $1900 per month. On December 4, 1998, the Trial Court ordered Mrs. Henderson to pay all expenses previously covered by the Order *Pendente Lite* from November 30, 1998 until the conclusion of the case. The Trial Court further stated that the expenses paid by Mr. Henderson pursuant to the Order *Pendente Lite* would be credited against Mrs. Henderson.

On January 7, 1999, the Trial Court granted the parties an absolute divorce. A trial occurred on January 7, 8, 15 and February 5, 1999, to resolve all other matters between the parties. On February 8, 1999, the Trial Court entered a Memorandum dividing the parties' assets and liabilities. Mrs. Henderson was awarded a judgment against Mr. Henderson in the amount of $114,068.79. No alimony or attorneys' fees were awarded. Mrs. Henderson filed a motion to alter or amend the order "to equitably divide the assets and liabilities of the parties, award Defendant alimony and health insurance and to award Defendant expenses of expert that testified at trial." The Trial Court denied Mrs. Henderson's motion. This appeal followed.

Mrs. Henderson raises the following issues, which we restate:

I.      Whether the evidence preponderates against the Trial Court's valuation of the marital business, Quality Systems, Inc.?
II.     Whether the Trial Court abused its discretion in dividing the marital assets?
III.    Whether the Trial Court abused its discretion in dividing the marital debt?
IV.     Whether the Trial Court abused its discretion in denying alimony and attorney's fees to the wife?
V.      Whether the Trial Court abused its discretion in requiring the wife to refund alimony *pendente lite* payments?

We affirm the Trial Court's order in every aspect, except for the denial of alimony. We remand to the trial court for a determination of the type and amount of alimony that should be awarded to Mrs. Henderson.

The parties testified as follows:


GEORGE ARNOLD HENDERSON

Mr. Henderson purchased the home at 117 Rue de Grande in Brentwood, Tennessee, in February 1982 for $122,000. Mrs. Henderson lived with him in that home during their marriage. Prior to their marriage, Mrs. Henderson owned three houses in Texas. Mr. Henderson spent over $20,000 repairing the homes in Texas. Two of the homes were repossessed and the other one was sold with the proceeds placed in Mrs. Henderson's account.

In May 1990, Mr. Henderson formed Quality Systems, Inc. He is the president and Chief Executive officer of Quality Systems. Gary Roberts is the Vice President and Marilyn Robson is the

Secretary and Treasurer. Mr. Henderson, Mr. Roberts and Ms. Robson are the members of the Board of Directors. He received no benefits or salary from Quality Systems until May 1995. During those five years, Mr. and Mrs. Henderson used Mr. Henderson's assets acquired before the marriage and Mr. Henderson loaned money to Quality Systems from these same assets. Quality Systems owes Mr. Henderson $79,804.75. In May 1995, he received a monthly salary of $6500 which increased to $10,000 by the time of the trial.

Quality Systems consists of direct sales of Perma-Crete and recruiting dealers to sell and use Perma-Crete. Perma-Crete is an acrylic polymer cement compound which resurfaces sidewalks, driveways, building exteriors, pool decks and pool interiors. Direct sales involve marketing, selling and installing Perma-Crete. Direct sales are only 10% of Quality Systems' business. Primarily, Quality Systems endeavors to recruit contractors to become dealers of Perma-Crete. Quality Systems does not manufacture Perma-Crete. Other companies are paid by Quality Systems to blend the bag mixes and sealers. At the end of 1998, Quality Systems had 22 employees. Since Quality Systems began in 1990, the lease premises have increased from 550 square feet to 8000 square feet.

The operating cash for Quality Systems is derived from the dealers. To become a Perma-Crete dealer, one must order a start-up package. The dealer must pay up-front for the start-up package, which includes a day of training in Nashville. In the start-up package, there is a quantity of bag mix, a quantity of bonding additive, the colorant, the sealer and marketing materials. The dealers must pay up-front for Perma-Crete products and the dealer receives a credit with Quality Systems. When the dealer orders Perma-Crete products, the credit with Quality Systems is reduced by the amount of the order. Quality Systems has 300 dealers with $375,000 in dealer credits. In other words, Quality Systems owes dealers $375,000 or $375,000 in Perma-Crete products. Due to the dealer credits and other liabilities, Quality Systems' liabilities exceed assets by $445,000 as of November 30, 1998.

In late January 1990, Mrs. Henderson became employed by Kroger's as a pharmacist. After she was terminated from Kroger's in 1991, Mrs. Henderson became an employee of Quality Systems. She worked for Quality Systems from April 1991 through August 1994. At first, she worked in the AT&T Security System division. In the AT&T Security System division, Mrs. Henderson was involved in selling home security systems. Her involvement constituted less than 9% of the sales in that division. Mr. Henderson sold the AT&T Security System division in December 1992 for a net loss of over $100,000. Mrs. Henderson remained home until early 1993 when she became a sales representative for the Perma-Crete division of Quality Systems. While employed at Quality Systems, Mrs. Henderson was paid commissions.

## MARILYN JO TUCKER HENDERSON

Prior to marrying Mr. Henderson, Mrs. Henderson owned three properties in Texas, some household furniture and a Nissan Sentra. Mr. Henderson renovated the properties with his own money. Two properties were repossessed and one was sold. Mrs. Henderson presumed the monies from the sale of the one property was placed into her checking account. She did not have access to her checking account because Mr. Henderson and Marilyn Robson, Mr. Henderson's bookkeeper, wrote her checks from the account if she needed money. Mr. Henderson and Ms. Robson were

signatories on Mrs. Henderson's checking account. Mrs. Henderson was not allowed to see any paperwork regarding her or her husband's finances during their marriage.

Mrs. Henderson worked as a pharmacist for Kroger's beginning in January 1990. After she was terminated from Kroger's in 1991, she began working for Quality Systems in the AT&T Security System division. From June 1991 through May 1992, Mrs. Henderson sold security systems, trained and hired salespeople and telemarketers, and installed security systems. According to Mrs. Henderson, she "ran" that division from its inception until it was sold in December 1992. Mrs. Henderson stated that the AT&T division was sold for $220,000. The gross receipts for the 21 months of operation were $779,000.

Once the AT&T division was sold, Mrs. Henderson began working in the Perma-Crete division in early 1993. She sold local Perma-Crete jobs for several months to allow new dealers to see local projects when they came to Nashville for training. After selling the Perma-Crete jobs, she installed the Perma-Crete with other installers for 4 months to complete all the jobs she sold. In September 1993, she returned to the office to recruit dealers. In August 1994, her health declined partially due to exposure to chemicals in Perma-Crete and she wanted to spend more time with her daughter from a previous marriage. Therefore, she quit going to the office. For the next 18 months, she talked to Mr. Henderson every morning for 2-3 hours regarding the overall direction of Quality Systems. She wrote several memos and reports to Mr. Henderson regarding a distributorship plan to dramatically increase revenue. Quality Systems continued to pay Mrs. Henderson through part of 1996.

Mrs. Henderson is a licensed pharmacist in Tennessee and Texas. She was a pharmacist for 14 years prior to meeting Mr. Henderson. The only other employment she had was a 10 month sales job where she enrolled people in a correspondence school for them to become travel agents.

## VALUATION OF MARITAL BUSINESS

Mr. Henderson's expert witness, Tom Price, valued Quality Systems at $108,248 as of November 30, 1998. Mr. Price is a partner with a Certified Public Accounting firm in Nashville, Price & Associates, and he is certified to perform business evaluations. For his evaluation of Quality Systems, Mr. Price toured the facilities and talked to Mr. Henderson, Marilyn Robson and other employees. He reviewed the general ledgers of 1997 and 1998, financial statements from 1990-1998, the business plan written in 1996, dealer growth analysis from 1993-1998, income tax returns from 1990-1998 and the subsidiary ledgers. Mr. Price compared Quality Systems to 3,392 companies in the same industry and derived an average net income, after tax, of 1.5% of total sales. He determined that Quality Systems' strengths are capable and efficient management, high-grade materials, large dealer network, fair market value leases on office warehouse and training facilities, excellent distributor relations and strong name recognition. Quality Systems' weaknesses are relative size to the rest of the industry, weak financial position, continued operating losses and lack of adequate working capital. In arriving at a value for Quality Systems, Mr. Price considered these strengths and weaknesses. Another consideration was the lack of marketability of Quality Systems' stock because it is a closely held corporation.

Mrs. Henderson's expert witness, William Neiman, valued Quality Systems at $1,551,443 as of November 30, 1998. Mr. Neiman is the president and only employee of Neiman-Ross Associates, Inc. He performs fixed asset valuations, such as machinery and real estate, and business valuations. Mr. Neiman visited the facilities of Quality Systems and talked to Mr. Henderson. He reviewed balance sheets and income statements from 1994-1998, account transaction histories, ledger trial balances, the lease for the premises and the business plan. Mr. Henderson wrote the business plan in 1996. In the business plan, Mr. Henderson stated his intention to take the company public in 2-3 years. However, Mr. Neiman did not consider the possibility of the company becoming public in his valuation. Instead, Mr. Neiman valued the company's future earnings potential. He considered the fact that the number of dealers with Quality Systems had increased at 96.67% annually over the last five years and the revenues per dealer had increased 6.38% annually. Gross sales had grown from $992,000 to $3,049,000 between 1994 and 1998. He compared Quality Systems to two other companies in the same industry, Dryvit and an unidentified small Tennessee company. In light of these facts, Mr. Neiman assessed a net operating income of 9.4% for Quality Systems as compared to Mr. Price assessing a 1.5% figure.

Mr. Henderson filed financial statements with Third National Bank. In the March 1994 financial statement, the listed value of Quality Systems was $153,000. In the December 1995 and March 1997 financial statements, the listed value of Quality Systems was $175,000.

"The value of a marital asset is determined by considering all relevant evidence regarding value. The burden is on the parties to produce competent evidence of value, and the parties are bound by the evidence they present. Thus the trial court, in its discretion, is free to place a value on a marital asset that is within the range of the evidence submitted." Wallace v. Wallace, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987) (citations omitted).

The Trial Court listened to two days of testimony regarding the value of Quality Systems. Many documents were submitted and reviewed by the Trial Court. In its discretion, the Trial Court placed a value of $450,000 less the sums owed to Mr. Henderson, $79,804.75, which equals $370,195.25. This value is within the range of the evidence submitted and we have no reason to question it. We affirm the Trial Court's valuation of Quality Systems, Inc.

<u>DIVISION OF MARITAL PROPERTY</u>
The following table shows the division of property by the Trial Court:

| Marital Property | Value by Court | Party to whom property awarded | Division to Husband | Division to Wife |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Quality Systems, Inc. | $370,195.25 | Husband | 75% of value= $277,646 | 25% of value (as a judgment against Husband) = $92,549 |
| Appreciation of Marital Home | $90,000 | Both | 50%= $45,000 | 50%= $45,000 |
| Personal Property | $12,000 | Both | 50%= $6,000 | 50%= $6,000 |
| 1993 Thunderbird | $4,250 | Wife | 50%= $2,125 | 50%= $2,125 |
| Husband's Retirement | $5,833.95 | Husband | 50%= $2,917 | 50%= $2,917 |
| Debt owed to parties by QSI | $79,804.75 | Both | 50%= $39,903 | 50%= $39,903 |
| **Total** | | | $373,591 | $188,494 (Total before Trial Court reduced for credits owed Husband) |

Tennessee Code Annotated Section 36-4-121(c) provides the following:

(c) In making equitable division of marital property, the court shall consider all relevant factors including:
(1) The duration of the marriage;
(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
(4) The relative ability of each party for future acquisitions of capital assets and income;
(5) The contribution of each party to the acquisition, preservation, appreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party; and

(10) Such other factors as are necessary to consider the equities between the parties.

The Trial Court possesses broad discretion in dividing the marital property and an appellate court will affirm the division unless the evidence preponderates against it. See Kinard v. Kinard, 986 S.W.2d 220, 230-31 (Tenn. Ct. App. 1998).

Mrs. Henderson argues that the division should have been equal. Because Mr. Henderson was awarded the home and the business, Mrs. Henderson argues that her award of the marital estate is inequitable.

Beginning in 1998, Mrs. Henderson received $1500 per month from a five-year disability insurance policy. She has been treated for chronic fatigue syndrome and has dyslexia. Mr. Henderson had a heart attack in 1995 and is taking many medications. He has continued to work at Quality Systems after his heart attack, but Mrs. Henderson has been unemployed. Mrs. Henderson contributed to the marriage as a homemaker while she was unemployed. Mrs. Henderson asserts that she will be unable to work as a pharmacist due to her health problems and her being terminated from Kroger's.

Mrs. Henderson's separate property consists of stock valued at $100,000 less a loan of $35,000 against the stock. Mr. Henderson's separate property consists of Coca-Cola stock valued at $106,000 less a loan of $89,229 against the stock. Mr. Henderson was awarded the home at 117 Rue de Grande, which he owned prior to the marriage, and Quality Systems, Inc. Mrs. Henderson was awarded a judgment against Mr. Henderson for $114,068.79. This figure was derived from Mrs. Henderson's total interest of $188,494 being reduced by $6,000 for Mrs. Henderson's interest in personal property to be received in kind, $4250 for the automobile she was awarded, $48,823.13 to equalize indebtedness, and $15,351.24 for alimony *pendente lite* payments paid after November 30, 1998.

After considering all the testimony, the Trial Court found Mrs. Henderson's contribution to Quality Systems was 25% of its value. The evidence does not preponderate against this finding. The rest of the marital property was divided equally. Applying the statutory factors, we find the division of the marital property was equitable overall.

DIVISION OF MARITAL DEBT

As in the division of marital property, the Trial Court possesses broad discretion in dividing the marital debt. Marital debts should be equitably divided between the parties. See Cutsinger v.

Cutsinger, 917 S.W.2d 238, 243 (Tenn. Ct. App. 1995). In dividing the debts, the court should trace the debts to the assets they purchased. See Mondelli v. Howard, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989)

"Courts should consider the following factors when they divide marital debts: (1) which party incurred the debt and the debt's purpose, (2) which party benefitted from incurring the debt, and (3) which party is best able to assume and repay the debt." Mondelli v. Howard, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989) (citations omitted).

Mr. Henderson's credit card debt is $61,416.59 and his loan against the Charles Schwab account is $89,229.67. Mrs. Henderson's credit card debt is $18,000 and her loan against her Equitable Securities account is $35,000. The Trial Court found that the loans against the stock accounts were "used for the accumulation and maintenance of marital property or for the costs of this action." The total debt of the parties is $203,646.26. The Trial Court divided the debt equally such that each party owed $101,823.13, but the Trial Court required Mr. Henderson to be responsible for the debt owed his Charles Schwab account and his credit card debt. Mr. Henderson's responsibility for debt totaled $150,646.26. Therefore, the Trial Court ordered that Mr. Henderson would receive a credit of $48,823.13 against Mrs. Henderson's interest in the marital property because the Trial Court ordered Mr. Henderson to be responsible for a greater share of the debt.

A majority of the debt was incurred for Quality Systems' benefit and living expenses for both parties. Both parties were awarded a portion of Quality Systems' value. We find the Trial Court properly divided the marital debt.

## ALIMONY

Tenn. Code Ann. § 36-5-101(d)(1) provides the following:

It is the intent of the general assembly that a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. . . . In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

(A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(C) The duration of the marriage;

-8-

(D) The age and mental condition of each party;

(E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(G) The separate assets of each party, both real and personal, tangible and intangible;

(H) The provisions made with regard to the marital property as defined in § 36-4-121;

(I) The standard of living of the parties established during the marriage;

(J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so;  and

(L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

In Goodman v. Goodman, 8 S.W.3d 289, 293 (Tenn. Ct. App. 1999), we described our review regarding alimony as follows:

> Trial courts have broad discretion concerning the amount and duration of spousal support.  Jones v. Jones, 784 S.W.2d 349, 352 (Tenn.App.1989).  These determinations are factually driven and require a balancing of the factors contained in Tenn. Code Ann. § 36-5-101(d).  As a general matter, we are disinclined to alter a trial court's spousal support decision unless the court manifestly abused its discretion.  Ingram v. Ingram, 721 S.W.2d 262, 264 (Tenn.App.1986).  With regard to alimony, courts are required to apply the factors set out in Tenn. Code Ann. § 36-5-101 to determine whether alimony is necessary or appropriate.

The Trial Court found this was not a proper case for the award of alimony, but there were no specific reasons stated.  We find the trial court should have awarded alimony.

Mrs. Henderson is economically disadvantaged as compared to Mr. Henderson.  He earns a salary from Quality Systems of $10,000 per month.  Mrs. Henderson receives $1500 per month disability from a disability policy.  The payments began in 1998 and end in 2003.  Mrs. Henderson is a licensed pharmacist, but her ability to find a job in that field is impaired by her chronic fatigue syndrome, dyslexia and her termination from her last job as a pharmacist.  She was terminated due to misconduct involving prescriptions for herself and Mr. Henderson.  Mrs. Henderson's standard of living has decreased significantly from the standard to which she was accustomed in the marriage.  Additionally, we find Mr. Henderson has the ability to pay alimony.

We remand this issue to the Trial Court for determination of which type of alimony to award and the amount to award.

## ATTORNEY'S FEES

"The decision to award attorney's fees lies within the sound discretion of the trial judge, and this court will not interfere with the trial judge's decision unless the evidence preponderates against it. A party is entitled to attorney's fees when he or she lacks sufficient funds to pay his or her legal expenses or would find it necessary to deplete other assets to do so." Sannella v. Sannella, 993 S.W.2d 73, 77-78 (Tenn. Ct. App. 1999) (citations omitted).

The Trial Court awarded a portion of the attorney's fees for Mrs. Henderson. Mr. Henderson was ordered to pay $9,264.82 in attorney's fees to the court to be dispersed to Mrs. Henderson's former attorney and her present attorney. We find that Mrs. Henderson has the ability to pay the remainder of her attorney's fees.

## REFUND OF ALIMONY *PENDENTE LITE* PAYMENTS

The Trial Court ordered Mrs. Henderson would be responsible as of November 30, 1998 for the expenses previously paid by Mr. Henderson pursuant to the *pendente lite* order. Mr. Henderson continued to pay these expenses through February 1999. The Trial Court properly ordered these payments of $15,351.24 to be credited against Mrs. Henderson's interest in the marital estate.

For the foregoing reasons the judgment of the Chancery Court is affirmed in part, vacated in part and the cause remanded for a determination of the type and amount of alimony to be awarded Mrs. Henderson and the collection of costs below. Costs of appeal are adjudged one half against Mr. Henderson and one half against Mrs. Henderson.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE